WONG BACK SUE v. CONNELL, Immigration Inspector.

(Circuit Court of Appeals, Ninth Circuit. July 3, 1916.)

No. 2611.

1. ALIENS ⬤⟶32(9)—DEPORTATION—DENIAL OF RIGHTS.
    While rule 22, subd. 4, par. "b," of the Bureau of Immigration, relating to the examination of aliens for deportation, and providing that they shall be advised of their rights to be represented by counsel, to procure witnesses, and to inspect the warrant of arrest, may be so arbitrarily enforced as to infringe the alien's fundamental rights, a Chinese person, whose deportation was sought, cannot, where he was, after his preliminary examination was practically concluded, advised of his right to counsel, to procure witnesses, to admission to bail, and to inspect the warrant of arrest, and the proceeding was delayed twice for the purpose of securing counsel, complain that before he was advised of his rights he was examined as to material matters; it appearing that no catch questions were asked.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 94; Dec. Dig. ⬤⟶ 32(9).]

2. ALIENS ⬤⟶32(6)—DEPORTATION—EVIDENCE.
    In a proceeding for the deportation of a Chinese person, a train inspection card attached to the application for warrant of arrest, appearing on its face to have been made out by an immigration inspector and to have been part of the files of the Bureau of Immigration, which was shown and read to the alien at his hearing, is admissible over an objection of lack of identification.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 94; Dec. Dig. ⬤⟶32(6).]

3. ALIENS ⬤⟶32(6)—DEPORTATION—EVIDENCE.
    In such case a photograph, identified by the alien as a picture of himself, which was also identified by persons who had claimed to have seen him in Mexico, was admissible.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 94; Dec. Dig. ⬤⟶32(6).]

4. ALIENS ⬤⟶27—ADMISSION TO UNITED STATES—DEPORTATION.
    Under the rules of the Secretary of Labor, made for the enforcement of the Chinese Exclusion Laws, which prohibit Chinese persons other than diplomatic or consular officers from entering the United States elsewhere than at the ports of San Francisco and San Diego, Cal., except where the Chinese are seeking admission or readmission from the Orient through Canada, and provide that any Chinese laborer claiming the right to leave and return to the United States shall make written application to the immigration officer located nearest to his place of business for preinvestigation of his claim, and requiring the alien to name

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the port at which he expects to depart from the United States, which shall be one of those designated, a Chinese person having a certificate of residence is not entitled to leave the United States for Mexico, or to return therefrom, save through the ports specified in the rules, though other ports were open for ordinary immigrants.

'[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 85–87; Dec. Dig. ☜27.]

5. ALIENS ☜27—CHINESE PERSONS—RETURN.

A Chinese person, though he obtained a certificate of residence in the United States, is not, having departed from the country, entitled to return, unless he secured a return certificate.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 85–87; Dec. Dig. ☜27.]

6. ALIENS ☜32(10)—CHINESE PERSONS—DEPORTATION.

Where a Chinese person unlawfully entered the United States from Mexico, he will be deported, not to Mexico, but to China.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 92; Dec. Dig. ☜32(10).]

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Benj. F. Bledsoe, Judge.

Petition by Wong Back Sue for writ of habeas corpus against Charles T. Connell, as Immigration Inspector in Charge. From an order denying the writ, petitioner appeals. Affirmed.

The petitioner was ordered deported to China, and was held pursuant to a warrant issued by the Secretary of Labor, which charged that appellant had entered the United States, landing near Calexico, Cal., on or about December 18, 1914, and in violation of section 7, Chinese Exclusion Act of September 13, 1888 (25 Stat. 477, c. 1015 [Comp. St. 1913, § 4308]), being a Chinese laborer who failed to produce to the proper officer the return certificate required by the aforesaid section.

The appellant makes these contentions: (1) That there was no fair hearing accorded petitioner by the immigration officials; (2) that there was no evidence that petitioner entered the United States near Calexico, Cal., on or about December 18, 1914, as charged, or at any other time or place, without inspection; (3) that there was no evidence that petitioner entered the United States at any time or place in violation of the act of Congress heretofore referred to; and (4) that, if petitioner was properly ordered deported, the order should have required deportation to Mexico, and not to China.

The record shows that at a warrant hearing before the immigration inspector at Yuma, Ariz., on January 24, 1915, warrant was "presented, read, and explained to the alien, who is advised of the nature of the proceedings and that he may be released from custody during the pendency of the case upon furnishing a satisfactory bond in the sum of $2,500." The testimony before the immigration official was substantially as follows: The alien testified that he was 66 years old, a subject of China, and that he came to San Francisco many years ago; that he had been a cook, and that he had a certificate of residence, issued in the name of Wong Back Sue, dated at Los Angeles, March 31, 1894; that he never had been back to China, never had been to Mexico, and knew no one in Mexicali, Mexico; and denied that he had come from El Centro, Cal., to Los Angeles, on the train on the 19th of December, 1914. He was shown the train inspection card, reciting that he had been inspected by Inspector Palmer on a train from El Centro, Cal., to Los Angeles, Cal., at El Centro on December 19, 1914, and also the card of Inspector Ellis on the same date and train at Indio, Cal.; but he denied that he took a train from El Centro to Los Angeles, and said it was a mis-

take, as he was in Los Angeles all the time; denied that he had met certain persons, who had made sworn statements that they had seen him in Mexicali, Mexico, during part of the years 1913 and 1914. He identified a photograph of himself, attached to an exhibit certification of the inspector, and said that he had left Yuma, Ariz., to go to Los Angeles, about 1910, and that in a previous statement to the officials he had made a mistake as to the time when he left Yuma. He said that he had received a certificate of residence in 1894; and that he had been treated at Los Angeles by a Chinese doctor, Dr. Wong, for a bad leg. The record further shows that at the hearing before the inspector, and as soon as the alien had made these statements, he was advised by the immigration inspector that he was now afforded an opportunity to inspect the warrant of arrest and all the evidence upon which the same was issued, and that he had a right to be represented by counsel at the hearing, and was asked if he wished to avail himself of the right. After stating that he desired to talk with his countrymen, adjournment was had for three days. When the three days had expired and the hearing was resumed, he said he had tried to secure a lawyer, but the one he wished was too busy, and he asked for another day in which to secure an attorney and to talk with him. Again the hearing was adjourned for a day, and, when resumed, petitioner stated that he had no money, and his countrymen were not able, or did not care, to help him, and that he could do nothing more. He was then asked if he waived all right to be represented by counsel at the hearing. His answer was, "Yes; I can't help it." He was also asked whether he had any other evidence to offer. He replied, "No; I have told you everything I know."

Among the exhibits attached to the application for the warrant of arrest was a statement made by the alien on January 16, 1915, before C. B. Franklin, inspector, in which the petitioner said that he had gone direct from Yuma, Ariz., to Los Angeles, three years before the date of the examination, which would be January, 1912; that he had been in Los Angeles ever since; that he left Yuma because, blood poisoning in his leg having developed, he went to Los Angeles for medical treatment for his leg, and that he had remained in Los Angeles continually thereafter until about January 8, 1915, when he went to Yuma, Ariz.; that he had been treated at Los Angeles by Dr. Wong Leng Woon, doctor for the Yick Sang Tong drug store. Petitioner produced a certificate of residence issued to him in California in March, 1904.

Appended also to the application for warrant of arrest were several sworn statements. William H. Tomkins, a stenographer living at Calexico, Cal., was shown the photograph which had been identified by the alien as a photograph of himself, and said that he had seen the Chinaman represented by the photograph about February, 1914, on the Loftus ranch in Mexico. George Henry, a Chinese merchant residing in Mexicali, Mexico, also recognized the photograph, and said that he had seen the Chinaman it represented in Mexicali, Mexico, about October, 1914. O. L. Hockenberry stated that he had seen the Chinaman represented by the photograph in Mexico during 1914, and that the Chinaman had worked on the Davis ranch. Jim Lee, a Chinaman, in his statement said that he lived in Mexicali, Mexico; that he recognized the Chinaman represented by the photograph, and that he had seen him in Mexicali, Mexico, about December, 1914. Wong Yut, a Chinese merchant in Los Angeles, Cal., said he knew the man represented by the photograph, and that he had left Los Angeles, saying he was going to Yuma, Ariz. Dr. Wong Sai Gin recognized the photograph of the petitioner, and said that he had met the man in 1906 at Los Angeles, and that just a few days before January 15, 1915, he had treated him for a cough, and that nothing was said about an injury to the leg, and that the man had told him he had come from some country town and was going to Yuma, Ariz.

Duke Stone, of Los Angeles, Cal., for appellant.

Albert Schoonover, U. S. Atty., and Clyde Moody, Asst. U. S. Atty., both of Los Angeles, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). [1] Rule 22, promulgated by the Bureau of Immigration of the Department of Labor, provides in part (subdivision 4, paragraph "b") as follows:

"During the course of the hearing the alien shall be allowed to inspect the warrant of arrest and all the evidence on which it was issued; and at such stage thereof as the officer before whom the hearing is held shall deem proper, he shall be apprised that he may thereafter be represented by counsel and shall be required then and there to state whether he desires counsel or waives the same, and his reply shall be entered on the record. If counsel be selected, he shall be permitted to be present during the further conduct of the hearing, to inspect and make a copy of the minutes of the hearing, so far as it has proceeded, and to offer evidence to meet any evidence theretofore or thereafter presented by the government. Objections and exceptions of counsel shall not be entered on the record, but may be dealt with in an accompanying brief. If during the hearing new facts are proved which constitute a reason additional to those stated in the warrant of arrest why the alien is in the country in violation of law, the alien's attention shall be directed to such facts and reason, and he shall be given an opportunity to show cause why he should not be deported therefor."

While this rule may be so arbitrarily applied by immigration officials as to deprive an alien of a full and fair hearing and violate his fundamental rights, as shown in Ong Chew Lung v. Burnett, 232 Fed. 853, —— C. C. A. ——, in our opinion the rights of the petitioner herein have not been transgressed. His examination appears to have been simply and fairly conducted. The questions asked were confined to material matters, and were expressed in very direct language, apparently used with no desire on the part of the inspector to entrap or oppress or "catch" the alien.

The question, therefore, is whether the fundamental rights of the alien were infringed by the action of the immigration officer in not telling the alien that he could inspect the warrant of arrest and that he had a right to counsel, and inquiring if he wished to avail himself of the right, until after direct preliminary examination of the alien by the inspector had been practically ended. If there were nothing in the record to counteract the injustice of such a course of procedure, we would be very strongly disposed to hold that the alien was not given a fair hearing, as required by law. But it expressly appears that, before any testimony was heard by the inspector, the warrant was read and explained to the alien, and that he was advised of the nature of the proceedings, and that he could be released on bail during their pendency. And while it would seem to be just that prior to a hearing before the immigration officials an alien should also be told of his right to have counsel at the hearing, yet, considering the information given to this petitioner, we cannot say that omission to tell him of his right until after material questions were put and answered invalidated the whole proceeding.

The case of Low Wah Suey v. Backus, 225 U. S. 460, 32 Sup. Ct. 734, 56 L. Ed. 1165, is determinative of the point under consideration. The court there states the settled rule of decision that hearings before executive departments or subordinate officials with respect to aliens found to be in the United States unlawfully may be made conclusive when fairly conducted, and that no successful attack by judicial proceedings upon the conclusions and orders made upon such hearings can be

made, unless it be shown that the proceedings were manifestly unfair, that the actions of the executive officers were such as to prevent a fair investigation, or that there was a manifest abuse of the discretion committed to them by the statute. The court was there considering a case where an order of deportation had been made, and the contention of the petitioner was that the Chinese person ordered deported was refused the right to be represented by counsel during all stages of the preliminary proceedings, and was examined without the presence of her counsel and against her will by the immigration officer and before she had been advised of her right to counsel, and before she was given an opportunity of securing bail, and that afterwards she was examined by the immigration officer against her will and without the presence of her counsel, who was refused permission to be present, and that at certain stages of the proceedings she was refused the right to consult with counsel. The court said:

"This objection, in substance, is that under examination before the inspection officer at first she had no counsel. Such an examination is within the authority of the statute, and it is not denied that at subsequent stages of the proceedings and before the hearing was closed or the orders were made she had the assistance and advice of counsel."

The court, mindful of the summary character of the hearing provided by statute, did not regard the actions of the immigration officials as having deprived the alien of a fair hearing. The immediate case can rest upon a much surer basis than that did, because, as already said, the nature of the proceedings was first explained to the alien, who was told of his right to have bail pending investigation, and who, before the hearing was closed, was not only told of his right to have counsel, but at his request was granted two adjournments that he might consult with his friends and obtain professional aid and advice; and it was not until after he had stated that he could not get counsel and told all that he knew that findings were made which led to the order of deportation by the Assistant Secretary of Labor.

[2] Objection to the admissibility of the train inspection card because of lack of identification is not well taken. The card was attached to the application for warrant of arrest; it was shown and read to the alien at his hearing before the immigration inspector. On its face it appeared to have been made out by an immigration inspector and appeared to be a part of the files of the Bureau of Immigration.

[3] The photograph which was also introduced at the hearing was shown to the alien and identified as a picture of himself.

[4] It is urged that the petitioner, if he was out of the United States, holding a certificate of residence as he did in the United States, had a right to re-enter the United States at Calexico, that being a designated port of entry under Rule 13, Immigration Rules of November 15, 1911. But the record shows that this petitioner was, and is, a subject of China, of the Chinese race, and a native of China, and by occupation a laborer. Exercising the authority conferred upon him by law, on January 24, 1914, the Secretary of Labor issued rules governing the admission of Chinese, and these rules superseded all previously issued rules and regulations and circulars of instruction re-

garding the enforcement of the Chinese Exclusion Laws inconsistent therewith. Rule 1 of the rules provides that:

"No Chinese person, other than a Chinese diplomatic or consular officer and attendants, shall be permitted to enter the United States elsewhere than at the ports of San Francisco, Cal.; * * * San Diego, Cal."

—except where the Chinese are seeking admission or readmission to the United States from the Orient through Canada, when special provision is made to apply. Further, by rule 13 of the rules approved January 24, 1914, it is provided that any Chinese laborer claiming the right to leave and return to the United States in accordance with sections 5 to 7 of the act of September 13, 1888, shall make written application to the immigration officer located nearest to his place of residence for preinvestigation of his claim as is specifically provided for in subdivision "a" of the rule. He is also required by the rule (subdivision "b"), to give a full description of himself, and to name "the port at which he expects to depart from the United States, which shall be one of those designated in rule 1." Thereafter investigation of the allegations made by the applicant is had, and the applicant is required to present duplicate of the application to the officers at the port of his departure. On the return of the applicant, it is provided by subdivision "i" of the rules, the original application is compared with the duplicate on file, and, after proof of identity, readmission is granted.

The only conclusion to be reached from an examination of these several rules is that the petitioner, being an alien laborer, had no right to leave the United States through any California port other than San Diego or San Francisco, and had no right to return to the United States except through the port from which he departed. United States v. Tuck Lee (D. C.) 120 Fed. 989.

[5] Petitioner argues that there is no proof of his entering into the United States. But the sworn statements of witnesses attached to the record filed by the petitioner clearly show that the alien was seen in Mexico shortly before he was found in the United States. The certificate of residence held by the alien became of no avail to him after he left the United States without procuring a return certificate. This would seem to be so because of the prohibition against leaving without first procuring a return certificate and without a proper re-entry through the port of the alien's departure. When, therefore, the question of his right to remain in the United States became involved, and the evidence showed that he had been in Mexico, it devolved upon the alien to show that his departure was lawful. Bun Chew v. Connell, 233 Fed. 220, —— C. C. A. ——. And inasmuch as the alien in this case took the ground that he never had been out of the United States, he ought not to be heard to say that his entry into the United States from Mexico was lawful.

[6] The last point made by the appellant is that even if the government's position is sound, and that the petitioner came into the United States from Mexico, then he should be deported to Mexico. This question was presented in Bun Chew v. Connell, as Inspector, supra, where we held that, under circumstances analogous to those herein, China was the country whence the alien came, and cited to sustain our

ruling Lewis v. Frick, 233 U. S. 291, 34 Sup. Ct. 488, 58 L. Ed. 967, Lee Sim v. United States, 218 Fed. 432, 134 C. C. A. 232, and Ex parte Chin Him (D. C.) 227 Fed. 131.

Affirmed.