men's and Harbor Workers' Compensation Act (33 USCA § 901 et seq.), for compensation for the death of her deceased husband, Isaac Williams, a stevedore, who died on August 2, 1927, as a result of injuries received in the course of his employment while at work in the hold of a vessel upon the navigable waters of the United States. That decree adjudged that the appellee Independence Indemnity Company, the insurance carrier, pay to the Treasury of the United States $1,000, as provided in section 44(c)(1) of the act mentioned (33 USCA § 944(c)(1). The following appears from the findings of fact, the correctness of which was not disputed: Appellant and the deceased employee were married in September, 1917. They lived together until some time in 1922 or 1923, when they separated, the deceased leaving appellant for justifiable cause. In 1923 appellant married Henry Coleman, and they lived together as man and wife for about two years. At the time of the death of Isaac Williams appellant was not living with him or dependent for support on him, and was not living apart for justifiable cause or by reason of his desertion at such time.

The claim asserted was resisted on the ground that appellant was not a beneficiary within the meaning of section 9 of the act (33 USCA § 909), which provides: "If the injury causes death, the compensation * * * shall be payable in the amount and to or for the benefit of the persons following: * * * If there be a surviving wife * * * and no child of the deceased under the age of 18 years, to such wife * * * 35 percentum of the average wages of the deceased, during widowhood, * * * with two years' compensation in one sum upon remarriage."

Section 2 of the act (33 USCA § 902(16) provides: "When used in this Act * * * (16) the term 'widow' includes only the decedent's wife living with or dependent for support upon him at the time of his death; or living apart for justifiable cause or by reason of his desertion at such time." The word "widow" was not used in any subsequent part of the act. That word means a woman who has lost her husband by death. Century Dictionary; Cole v. Mayne (C. C.) 122 F. 836, 839. The words "surviving wife" used in section 9 of the act describe the same person as would have been described by the word widow. That the words "surviving wife" in the above-quoted provision of section 9 were intended to be the equivalent of the word "widow" is indicated by the succeeding part of the same sentence which makes the prescribed compensation payable "during widowhood." A preceding section of the act

having defined the word "widow" when used in the act, it is to be inferred that an intended effect of making the prescribed compensation payable "during widowhood" was to keep the right provided for from accruing in favor of one who was the wife of the deceased employee at the time of his death, but whose state or condition at that time was not that of a widow as defined in section 2 of the act. We are of opinion that above set out provisions of the act show that a right to the prescribed compensation was not intended to be conferred on one who was the wife of a deceased employee at the time of his death, but who at that time was not living with him or dependent for support on him, or living apart for justifiable cause or by reason of his desertion at such time. We conclude that the court did not err in disallowing the claim asserted by appellant.

The decree to that effect is affirmed.

FLYNN ex rel. CHIN TAI SING v. TILLINGHAST, Commissioner of Immigration.

Circuit Court of Appeals, First Circuit. October 17, 1929.

No. 2378.

The opinion of Judge Morton in the District Court is as follows:

The citizenship of the father is conceded, the excluding decision having been

based on the refusal of the immigration tribunals to accept the evidence of relationship. The question is whether, in so doing, they acted arbitrarily and unreasonably.

In 1926 the alleged father was examined with reference to a son of the same name as the applicant whose status was under pre-investigation for entrance into this country; and he submitted an affidavit containing photographs of himself and his alleged son. The effort to bring the boy in at that time apparently was not followed up. In 1928, in connection with the present application for admittance, the father voluntarily stated to the immigration service that the photograph annexed to his 1926 affidavit was not that of his son; that by a mistake the photograph of a stranger had been sent to him and annexed; and that he did not then call attention to the mistake because, having last seen the boy 10 years before when he was only 6 years old, he was himself deceived by the blunder in the mercantile house, where the photographs were confused. This is of course a possible explanation of an admitted blunder. The question is whether it is true, or whether a substitution has been attempted. The alleged father says that he first learned of the mistake in 1927 when his wife sent him correct photographs of their son. The applicant, however, testifies that he knew nothing about his coming to the United States until 1928 when he was told to go to Hong Kong and get photographs to send to his father in connection with his coming here; that he then went and had his picture taken and had never done so before; that the photographs were sent directly to his father from the store in Hong Kong and his mother never saw a photograph of him.

This discrepancy is in itself sufficiently serious to justify a finding that the explanation given of the 1926 photograph is false and the relationship not proved. But in addition to it, the alleged father's testimony about his children given at different times in previous proceedings was not consistent. Moreover, he said that his father was dead, while the applicant testified that his paternal grandfather was living in China. The father testified that his home village had neither well nor place of worship, but the applicant says it has both and has always had them. The father's long absence from China may fairly account for loss of memory about details of the village and its surroundings, but not about such basic facts as these.

Without further discussing the evidence, or attempting to say where the truth lies —which is for the immigration tribunals to determine—I am clearly of opinion that their decision, adverse to the applicant, cannot be said to be either arbitrary or unreasonable.

Petition dismissed.

Walter Bates Farr, of Boston, Mass. (E. F. Damon, of Boston, Mass., on the brief), for appellant.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

PER CURIAM. The following final decree is entered without opinion: For the reasons set forth in the opinion of the District Court, the decree of the District Court is affirmed.

**CARBIDE & CARBON CHEMICALS CORPORATION, Plaintiff-Appellant, v. PHILLIPS PETROLEUM COMPANY, Defendant-Appellee.**

Circuit Court of Appeals, Third Circuit. August 21, 1929.

Rehearing Denied November 7, 1929.

No. 3883.

Mayer, Warfield & Watson, of New York City, and William G. Mahaffy, of Wilmington, Del. (Frederic P. Warfield, Leonard A. Watson, and C. P. Townsend, all of New York City, of counsel), for appellant.

James L. Boyce, of Wilmington, Del. (Merrell E. Clark, of New York City, and George A. Prevost and Robert E. Barry, both of Washington, D. C., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In an exhaustive opinion reported at 28 F.(2d) 218, the court below discussed the patent granted De Brey for a process of making gasoline from natural gas, and held it invalid. The District Court for the Southern District of Texas, in a comprehensive opinion, Carbide & Carbon Chemicals Corporation v. Texas Co., reported at 21 F.(2d) 199, reached the same conclusion, and on ap-