[Crim. No. 3524.   Second Dist., Div. Two.   Feb. 25, 1942.]

THE PEOPLE, Respondent v. BOBBY CORDERO, Appellant.

Harvey J. Lindstrom and Robert Porter for Appellant.

Earl Warren, Attorney General, and Eugene M. Elson, Deputy Attorney General, for Respondent.

MOORE, P. J.—Defendant was convicted of having in his possession a firearm having a barrel less than twelve inches in length, capable of being concealed upon his person, he being at the time of such possession not a citizen of the United States. The statute under which he was accused is known as the Deadly Weapons Act (chapter 339, Statutes of 1923, as amended statutes 1931, p. 2316; section 2, Act 1970, Deering's General Laws.) His violation was evidently deemed to have been free of any criminal intent by reason of the fact that while the statute makes the offense a felony, appellant's punishment was fixed at one day in the county jail.

148

Two facts were established at the trial, namely that defendant is an unnaturalized native of the island of Luzon and that he did in fact possess the firearm in question. His only contentions before this court are: (1) that his conviction was in violation of the due process clause of the 14th Amendment to the federal Constitution and (2) that section 1983 of the Code of Civil Procedure, which placed upon an alleged alien the burden of proving his citizenship, does not apply to members of the Filipino race.

The police power is the power inherent in the government itself to enact laws within constitutional limits for the protection of the order, safety, health and general welfare of society. (12 C. J. 904.) Since the right of the legislature to exercise that power is not to be denied on account of any grant heretofore made, it is appropriate to enact legislation restricting privileges commonly exercised by citizens by denying the enjoyment thereof to foreigners. The 14th Amendment was not designed to interfere with the police power of the several states. (*Barbier* v. *Connolly*, 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923].) Therefore if section 2 is a valid exercise of the police power no constitutional guarantee of the defendant has been violated. The enactment of such laws as the Deadly Weapons Act is a proper exercise of the police power. It was especially authorized by section 1, article XIX of the Constitution which requires the legislature to protect the state from "the burdens and evils arising from the presence of aliens who are, or may become . . . criminals . . . and from aliens otherwise dangerous or detrimental to the well-being or peace of the State . . ." The section is proof that the people had taken cognizance of a social condition fraught with such peril to the state as to require regulation. Since the statute is equal in its operation, it does not violate due process. (*In re Kemmler*, 136 U. S. 436 [10 Sup. Ct. 930, 34 L. Ed. 519]; *In re Rameriz*, 193 Cal. 633 [226 Pac. 914, 34 A. L. R. 51].) If the law makers find conditions that require regulation by statute, they are acting within the scope of their powers to enact appropriate legislation to meet the requirements. (*Miller* v. *Wilson*, 236 U. S. 373 [35 Sup. Ct. 342, 59 L. Ed. 628].)

In proving its case against the defendant, the People relied on section 1983 Code Civ. Proc. It provides that, when it is alleged in a pleading that a privilege has been exercised by the defendant who is not a citizen of the United States,

after it has been established that such privilege was exercised by defendant, then "the burden shall be upon such person . . . to establish the fact" that he was at the time a citizen of the United States and was legally entitled to exercise such privilege. Prior to 1927 it was the law that the foreign nativity of an accused person was a part of the corpus delicti of the offense denounced. (*People* v. *Quarez,* 196 Cal. 404 [238 Pac. 363].) But in that year the legislature enacted section 1983, *supra.* This statute established the "rule of convenience." Its purpose was to relieve the state of the burden of proving the alienage of the accused because such fact is "intimately and peculiarly within the knowledge of the person who by the exercise of certain rights has assumed to be native born." (*People* v. *Osaki,* 209 Cal. 169, 192 [286 Pac. 1025] ; *People* v. *Bruno,* 209 Cal. 782 [286 Pac. 1037] ; *People* v. *Guzman,* 209 Cal. 783 [286 Pac. 1037] ; *People* v. *Cortez,* 112 Cal. App. 22 [296 Pac. 98].) However, in 1934 the United States Supreme Court reversed a conviction (*Morrison* v. *California,* 291 U. S. 82 [54 Sup. Ct. 281, 78 L. Ed. 664]) where a citizen had been jointly convicted with an alien for conspiracy to violate section 9-a of the Alien Land Law. But that case is not authority for appellant's position here for the reason that Morrison was an American and he could not be denied his rights under the due process clause. The court cited a long line of authorities holding that a statute which casts the burden of proving citizenship upon an alleged alien, after establishing his commission of the crime, is valid and holding that a former decision (*Morrison* v. *California,* 288 U. S. 591 [53 Sup. Ct. 401, 77 L. Ed. 970]) correctly held that section 9-b of the Alien Land Law which cast the burden upon the accused of proving his citizenship was not an impairment of his immunities under the federal Constitution.

Appellant contends that in the enactment of section 2 of the Deadly Weapons Act, it was not contemplated that a native of the Philippine Islands should be included among those persons not citizens of the United States. He maintains that, since he owes allegiance to the Government of the United States, he is therefore a national and entitled to enjoy all privileges shared by citizens. He suggests that the absence from the law books of decisions involving the alienage of Filipinos indicates a universal view that they should not be subjected to the enforcement of this act. A review of the statutes discloses the futility of his claims.

Section 57 of the Political Code does not avail appellant. That section merely attempts to classify the population of California with a view of assigning to each its political rights. But, in enacting the Deadly Weapons Act the paramount aim was to protect the security and tranquillity of the state and of the members of each alien group. It was conceived that such purpose might be promoted by denying to all persons not citizens of the United States the right to possess firearms which could be concealed upon the person.

It might be conceded that a native of Luzon was not an alien insofar as he owed allegiance to the United States as against other sovereignties until the complete independence of the Philippines. Such allegiance was the natural reaction of a proud people to a benevolent protector.

Notwithstanding the fact that the Governments of the United States and the Philippines have amiably collaborated for the improvement of the economy, for the increase of liberty and for the upbuilding of the civilization of the islands, yet the Philippine Islands have never been incorporated into the United States. They constitute merely an insular possession appurtenant to the United States. By the Treaty of Paris in 1898 the civil and political status of the Filipinos was to be determined by Congress (42 Harv. L. Rev., 809). No act of that body has ever conferred citizenship upon them (*Ibid*). The islands are a dependency until admitted into the union or until this government surrenders its jurisdiction over that territory. (Opinion U. S. Attorney General, 34 Opinion 1924, p. 287; 34 Opinion 1925, p. 460). The inhabitants of those islands are deemed and held to be citizens of the Philippine Islands and its people ''shall be considered as if they were aliens.'' (Secs. 1002, 1238, chap. V, title 48 U. S. C. A.) ''For immigration purposes the Philippine Islands shall be considered as a separate country.'' (Sec. 1238, *supra*.)

Finally, in 1933 at the request of the government of that domain Congress enacted a statute granting complete independence to the Philippine Islands effective as of July 3, 1946. (See title 48, sec. 1231, U. S. C. A.) If they are to be granted such independence, their people could not now be our citizens and the islands could not now be a part of the United States. If they were, their complete independence would be a secession—a right which perished forever in the flames of civil war. Their present status makes the natives of the Phil-

ippines our associates in peace and our allies in war. The policy of the government since the Treaty of Paris has been that of protecting the Filipinos as our nationals in foreign lands and of rendering paternal beneficences to them, to the end that they might take a dignified position among the commonwealth of nations as a separate and independent republic. No legislation was ever enacted nor any treaty approved which placed the Philippine Islands in the same status as that of territorial possessions belonging to the United States.

It has been repeatedly held that the inhibition against the possession of firearms by aliens applies to any unnaturalized foreign-born person. (*In re Ramirez, supra; People* v. *Cannizzaro,* 138 Cal. App. 28 [31 Pac. (2d) 1066].) Since a native of Luzon is an unnaturalized foreign-born, his possession of such firearm as that inhibited by the Deadly Weapons Act constitutes a violation thereof.

Judgment and order denying motion for new trial are affirmed.

WOOD, J., and McCOMB, J., Concurring.—We concur in the order affirming the conviction. The statute under which defendant was convicted provides that ''no person not a citizen of the United States of America . . . shall own or have in his possession . . . any pistol . . .'' Defendant does not present the contention that he is a citizen of the United States, a contention that would be futile in view of the express provision in a federal statute relating to immigration that the Filipinos ''shall be considered as if they were aliens.'' (48 U. S. C. A., secs. 1002, 1238).

The Supreme Court of California has on several occasions held that section 1983 of the Code of Civil Procedure, which places the burden on a defendant to establish citizenship, does not violate any constitutional provision. (*People* v. *Osaki,* 209 Cal. 169 [286 Pac. 1025] ; *People* v. *Bruno,* 209 Cal. 782 [286 Pac. 1037] ; *People* v. *Guzman,* 209 Cal. 783 [286 Pac. 1037].)

Appellant's petition for a hearing by the Supreme Court was denied March 27, 1942. Houser, J., Carter, J., and Traynor, J., voted for a hearing.